DUNCAN, J.,
delivered the opinion of the court. The question for the consideration of the court is new, although founded upon a statute as old as 1788. It is important, in order to a proper construction of that statute, not only to look to the language employed in it, but to see how the law stood prior thereto.
In the statute branching out the general court into district courts, passed in 1788, it is provided, that juries de medietate linguae may be directed by the [district] court. But the manner in which this power was to be executed, was not indicated by the statute.
*By an ordinance of convention passed in 1776, it is provided, that the common law of England, all statutes made in aid- of the common law prior to the 4th year of king James I. and which are of a general nature not local to that *757 kingdom, shall be the rule of decision, and shall be in full force, until the same shall be altered by the legislature. The common law of England or the english statutes falling within the purview of this ordinance of convention, furnish the only means of determining the construction to be given to the statute of 1788.
By the common law, the crown might, in the exercise of its prerogative, and occasionally did, exercise the power of giving to aliens a trial by a jury de medietate linguae; but the power was exercised, or withheld, at the discretion of the crown. And so the law remained in England, until the reign of Edward III. when a policy was adopted, purely local in its object, which became the foundation of the subsequent power and glory of the british empire. In order to attract to England, artisans from the continent, where manufactures were greatly in advance of England, the strongest inducements were held out, and privileges were extended to aliens, which, in the language of an english historian, “were not permitted by any other government in the world.” In pursuance of this policy, the statute staple was passed in the 27th year of Edward III. whereby marts for the purpose of exclusive trade were established, where strangers were invited to settle; and to protect them from the prevailing prejudices of the english people against them, special tribunals were created for the adjudication of all causes connected with trade and commerce; and whenever an alien became a , party, a jury de medietate lingua; was directed for the trial of his cause. But as the jurisdiction of these tribunals was limited to the trial of civil causes growing out of mercantile or' trading transactions, in *the following year, the statute 28 Ed. 3, stat. 2, ch. 13, was passed, giving, in all cases, whether civil or criminal, when an alien was a party, a jury de medietate linguse, if he required it. This was not a discretionary power vested in the courts, but mandatory at the will of the alien. This mode of trial, then, which by the common law was a mere favour to be extended or withheld by the crown, became the right of the alien, when demanded of the courts. The statute of 28 Ed. 3, was in force in England, when the ordinance of the Virginia convention in 1776, and the subsequent statute of 1788, were passed; and in deciding the question before us, it is necessary to determine whether the statute of the 28 Ed. 3, was adopted by the ordinance of convention of 1776; since,, if it was, it furnished the rule for the construction of the statute of 1788, declaring that the courts may order juries de medietate lingua; but if the statute 28 Ed. 3, was not adopted by the ordinance of convention, then the common law, and not the statute, furnishes the rule for expounding the Virginia statute.
A majority of the judges are of opinion, that the statute of the 28 Ed. 3, never was in force in Virginia, either during its colonial dependence, or by force of the ordinance of convention of 1776, and that the Virginia statute of 1788 was only intended to confer upon the judiciary the same discretionary power over the subject which by the common law constituted a portion of the royal prerogative. We find, upon an examination of the records of the general court, from the year 1776, down to 1788 (when the Virginia statute was enacted) during which time this court had judicial cognizance of the business of the country,— a period too when the public mind was inflamed by the revolutionary struggle, — that there was no case in which a jury de med-ietate linguae was allowed, nor have we found any memorial of the exercise of the power during the colonial *government. And it may be proper to remark, that had it been the intention of the legislature in 1788, to adopt the eng-lish statute of 28 Ed. 3, it is not probable, with the statute before it, that it would have used language which, in its ordinary acceptation, implied a discretion, when the statute it was adopting was mandatory : nor is it probable that, in this particular instance, the legislature would have departed from the rule, which we believe was applied to every other english statute incorporated into our code, of adopting the same language employed in the english statute, only changing or modifying the 'language to suit the altered condition of the country, because, in adopting an eng-lish statute into our code, it carried with it the construction given to it by the eng-lish courts prior to its adoption here. And such, doubtless, would have been the form of the Virginia statute of 1788, had the legislature intended to adopt the english statute of 28 Ed. 3. But if the legislature intended only to adopt the common taw discretionary power upon this subject, then the terms employed were consistent with' that intention. And as the common law was declared to be in force in Virginia, the only necessity that existed for legislating at all upon the subject, arose from tlie separation in this country, of the executive and judicial powers of the government: whereas by the common taw this discretionary judicial power was vested in the crown, the power, when authorized to be exercised here, was transferred to the courts.
Some of the judges are of opinion, that the principles of the statute of 28 Ed. 3, are unsuited to. the nature of our institutions, the character of our people, and the structure of our judiciary. The english statute was enacted in aid of a wise policy at the time; yet it was a local policy, confined to the country in which it originated ; and the comity of nations, except in that particular instance, has never gone so far as to ^extend to aliens higher judicial privileges than were extended to citizens. In England, the jealousy of the common law denied to aliens the privileges of citizenship. To compensate the alien for the disabilities under which he laboured, a jury to try his causes, composed of equal numbers of aliens and citizens, was allowed to him. And, practically, there was no great inconvenience in doing so, compared with benefit to be derived from attracting to the country the skill and capital of foreign artisans and merchants, then rendered necessary by the *758 infant state of the trade and manufactures of the country. Besides, the aliens, in that country, spoke a different language, and were collected together at the various marts of trade, and could easily be distinguished from the citizens. It is not so, and never was so, in this country. The moment an alien sets his foot upon our shores, he acquires rights unknown to the laws of England. All aliens may, in a few years, become citizens: they are scattered through the country, instead of being confined, as originally they were in England, to certain places; three-fourths of them speak the language of the country, and are in some degree familiar with its laws; and from the recent settlement of the country by immigrants from abroad, and the continual influx of foreign immigration, there can exist no such prejudice against them as gave rise to fhe statute of 28 Ed. 3. And let us see what would be the practical operation of the english statute, if it were In force here. Suppose the statute authorized a trial by a jury de medietate linguae in all cases where an alien is a party, civil as well as criminal, except treason, if the demand exceed twenty dollars, and the alien require it; the court must order, and the sheriff must summon, if they can be found in his county, a jury composed, in part, of six aliens; and it will be no excuse, that his county is large, and the aliens dispersed. If six may be found, he must hunt them up; *and, in the meantime, the trial must be suspended (as was required in the case under consideration) until they can be got. A large proportion of the aliens in this country (differing, in that respect, from aliens in England) speak the language of the country; and, owing to’the facility of acquiring citizenship, it would be difficult to ascertain, whether the foreigner was an alien or a citizen; yet the sheriff must be presumed to know who are aliens, and who are not, and the courts may, in every case, be called upon to decide whether the juror, who is summoned as an alien, may not be a naturalized citizen. But these are not the only anomalies growing out of such a proceeding: the citizen can only have his cause tried by jurors having a certain, property qualification; a qualification supposed to be a test of the fitness of the juror to act in that capacity. But the alien can have his cause tried by a jury, half of whom may be fugitives and vagabonds, the “scum of the old world cast upon our shores;” — for if there be six aliens in the county, let them be what they may, they must be put upon the jury, if the alien wills it. The aliens, so placed upon the jury, may not understand a word of our language, and yet they are to try a cause, the testimony and the pleadings in which are in a language of which they are ignorant, and must decide upon laws about which they know nothing. Nor are these all the objections that may be urged against that mode of trial. The great end and aim of jury trial, is to insure fairness and impartiality; and every safeguard should be placed around that mode of trial: yet, if in every case where an alien is concerned, a jury de medietate linguae is to be allowed (and it must be demandable of right in every case, or in none) with what ease, amounting almost to certainty, may justice be defeated? Eor example, let an alien employed upon our public works (where they are found in numbers) murder, assault, or otherwise maltreat a citizen ; if *'when put upon his trial for it, he is entitled to six jurors who are aliens, probably his countrymen, peradventure his associates, men like himself, with no interest in the country, indifferent to its laws, .and reckless of its peace; would such jurors convict? We are aware, that this reasoning may be considered as applying to the impolicy of the law, rather than as proving that the law does not exist. But we are of opinion, that it is a fair argument for the purpose of shewing that the legislature did not intend, when it enacted the statute of 1788, to incorporate in it the english statute of 28 Ed. 3, open as it would be, in its application to this country, to the objections that have been pointed out, but only intended to confer upon the courts the ancient common law discretionary power over the subject, — a sound judicial discretion.
It is to be observed, further, that the legislature in 1792, when engaged in the great work of establishing a code of laws adapted to the altered condition of the country, after having' enacted many of the english statutes, very frequently in the identical language of them, re-enacted the statute of 1788, and then repealed all the english statutes which had been temporarily adopted by the ordinance of convention of 1776. If, therefore, the statute of 28 Ed. 3, was intended to be embraced by the ordinance of convention, it was, as an english statute, repealed by the act of 1792, leaving the Virginia statute of 1788 concerning juries de medietate linguae, without any support from the english statute, and depending alone upon the common law as furnishing the means for expounding it. So that, if the statute of 28 Ed. 3, was ever in force in Virginia, it ceased to be in force after the repealing statute of 1792.
We have felt the force of the argument, that the word may, used in the Virginia statute, should be construed imperatively, and be taken as equivalent to shall. It is undeniably correct, that when the performance of a *public duty is required of the court, the word may is mandatory. Thus the county courts may lay a levy for certain purposes; this would be construed shall lay a levy &c. and in criminal cases, where a benefit or privilege is intended to be secured to the prisoner or accused, ordinarily and as a general rule, the term may, if employed, will be construed imperatively. But this rule must always yield to the obvious intention of the legislature. We have endeavoured to shew, that tjie intention of the legislature was only to give to the courts a discretionary power to direct juries de medietate linguae; and that, consequently, the word may, as used in this statute, should receive its literal interpretation.
A majority of the court, therefore, are of opinion, that the circuit superior court in the case under consideration, although in *759 the first instance it directed a jury de medietate linguae, might with propriety, for aught that appears in the record, have refused to do so; and that the same discretionary power that justified the order to summon such a jury in the first instance, authorized the court to refuse it in the last; and nothing appears in the record to shew that the discretion given by the statute has not been properly exercised.
BROWN, FRY, CHRISTIAN and ROBERTSON, J., dissented from the opinion and the judgment. And the following opinion (in which Fry and Christian, J., expressed their concurrence) was delivered by
ROBERTSON, J.
No question which concerns the due administration of the criminal laws of a state can be regarded as unimportant. Especially is it incumbent on those whose province it is finally to determine the true construction of the penal code, to pause and ponder well before they break down or weaken the barriers erected against oppression and prejudice. On this account perhaps, rather than on account of its "^practical or intrinsic importance, the present case has received a more than ordinary share of attention. Finding myself, after the best consideration, constrained to dissent from the opinion of a majority of the court, it is but respectful to them, as well as due to myself to assign some of the reasons which have influenced my judgment.
The privilege of a jury de medietate has existed in England from an extremely remote antiquity. It is said, no medietas lingua; was at the common law; and it seems certain that the courts had no power to award it: but in the old treatise entitled Trials per Pais (p. 210,) we are told that ‘This trial, by the common law, was wont to be obtained of the king by his grant.” Be this as it may it, it was allowed as early as the reign of Ethelred (in the 10th century) to Welshmen, who were then aliens: and to a jew as early as the 9th of Edw. 1, (the year 1281). It was expressly accorded (only however in civil cases) to alien merchants by the statute of the staple, 27 Edw. 3, stat. 2, ch. 8, (1353) ; indeed, if the parties were all aliens, a full jury of aliens was given: and by a statute passed the succeeding year, the jury de medietate was extended to all aliens, and to “all manner of inquests and proofs.” (28 Edw. 3, ch. 13, | 2.) And on this footing it continued until doubts of its existence were created by the general terms of the statute 2 Hen. 5, stat. 2, ch. 3, declaring the qualifications of jurors. To remove these doubts or remedy the inconvenience, the 8 Hen. 6, ch. 29, was passed, evincing the great solicitude of the english j’eople to preserve the privilege unimpaired. In the same spirit, it is believed, the courts of England have expounded the statutes according it. They have held that subsequent statutes, no matter how generally expressed, fixing the qualifications of jurors, do not apply to de juries de medietate: that in trials where medietas linguae is required, the alien may be aided de circumstantibus, *(and this, though it seems, by the words of the act, no tales is granted in such cases), because the statute was made or the speedy execution of justice, and should be expounded favourably to serve the intent of the makers. 2 Hawk. P. C. ch. 43, | 35; 21 Vin. Abr. 187; Jenk. 288, pi. 14, 10 Rep. 104, citing Julius Caesar’s case. The tales moreover, we are told in the quaint language of the author of Trials per Pais (p. 72, 74,) ought to be of the same quality as the qua les; for “tales are words similitudinary: therefore, if the first jury be per medietatem linguae, so ought the tales to be.” Nor have I been able to find a solitary instance on record, of refusal by the english courts to award the writ in question when prayed for in due time by an alien, since the statute of Edw. 3, — though Blackstone says (3 Black. Comm. 361,) some question may now exist how far the statute 3 Geo. 2, ch. 25, hath undesignedly abridged this privilege in civil cases.
Turning to our own state, we find it much more difficult to ascertain the true history, origin or extent of the privilege in question. We have no printed reports of criminal cases of an earlier date than 1789, nor any printed report whatever, so far as I have discovered, of a decision on the particular subject.
It is doubted whether the privilege existed at all, either by law or usage, during our colonial history. It is doubted also whether it could be granted under the ordinance of 1776, adopting the common law of England, and all acts of parliament prior to the 4th of James I. “and which are of a general nature, not local to that kingdom.”
I deem it unnecessary to give the reasons which incline me to the opinion that it was always demandable of right in Virginia, sihce that opinion has no influence on the particular question before us. That question must depend on the proper construction of laws passed since the revolution, and which I now proceed to consider.
*The first instance we have been able to find of any direct legislation upon the subject, is in the act “establishing district courts and for regulating the general court,” passed in 1788; 12 Hen. stat. at large, p. 730. The 44th section is in these words: “Juries de medietate linguae may be directed by the court to be summoned.” In 1792, this provision was transposed to the act “concerning grand juries, petit juries, and veniremen,” with a slight alteration in phraseology: “Juries de medietate linguae may be directed by the courts respectively.” 1 Old Rev. Code, ch. 73, $ 13. This last act preceded that repealing the british statutes, though both were passed at the same session. I note these circumstances to shew that the provision was probably intended to obviate the consequence which would have resulted to aliens, in respect to this privilege, by the repeal of the british statutes; and to shew that it was not casually or inadvertently introduced into our code at the session of 1792, but upon deliberate consideration. And it was again deliberately re-enacted at the revisal of 1819: see the act to reduce into one the several acts concerning grand *760 juries and petit juries, 1 Rev. Code of 1819, ch. 75, \ 13, p. 266.
The privilege therefore has existed of. right or in the discretion of the several courts of criminal jurisdiction, undeniably, by express statutory provision, for upwards of fifty years.
The instances in which it has been claimed (much to the honour of our state) have not been frequent. Several of the judges of this court, I understand, have awarded it in their respective circuits. Only one instance has fallen under my own personal observation, in which it was applied for; the trial of Eowther for murder, before the late fuperior court of law for Henrico county. In that case, on the prisoner’s motion, judge Brockenbrough quashed the venire facias and panel, and awarded a ven-ire facias de medietate linguae. *The present case, and that of Brown, now before us on petitions for writs of error, are the first, so far as my information extends, in which the jury de medietate was ever refused in a criminal case; when asked by an alien in proper time.
In the case of Richards, the more immediate subject of consideration, the writ in point of fact was actually directed, and a jury de medietate summoned. Of the aliens summoned, there only appeared, one of whom was challenged by the prisoner for cause; and there being a defect of jurymen such as the precept required, the prisoner moved the court instanter, either to compel the attendance of the veniremen who had been summoned, or to order the sheriff to summon as many other aliens as would make up a jury de medietate. The court overruled his motion, notwithstanding the admission of the attorney for the commonwealth that there were other aliens in the county sufficient to complete the jury, and a jury was impaneled consisting of ten denizens and two aliens; the first, it is believed, of that description, ever impaneled under such circumstances, either for the trial of a denizen or an alien.
If the prisoner was not entitled to a jury de medietate, it was clear error to put aliens of any number on the panel: if he was, he was entitled to a full moiety of aliens, provided they could be had. 21 Yin. Abr. 188, pi. 5; Id. 189, pi. 1. Such, ás I understand it, is che law, and so are the precedents : and I am yet to see one to the contrary, if such exist in England or in Virginia. Ought we now to make this precedent?
It is said the language of our statute differs from that of the english statute, and justifies a different course of proceeding : and the attorney general contends, that under our act the privilege is in no case demandable of right, but the grant of it is discretionary with the courts. Such is not my opinion. It is true the terms used are, that juries de medietate may be directed. But where a *statute directs a thing for the sake of justice or the public good, may is the same as shall. .Salk. 609; 6 Bac. Abr. 379. Had the law used the term “must” or “shall,” it might have been construed as compulsory on the courts in all cases where aliens were parties, whether civilly or criminally, and | whether they prayed for such juries or not. But the learned committee of revisors who first inserted the provision in the bill concerning juries, as well as the general assembly who made it the law, must be presumed to have known, that to the general rule giving the privilege in question, as well as to all others, there were or might be some exceptions. It was known that in England the writ would never be issued unless prayed for; nor unless prayed for in proper time, (although it has been allowed in England even after the return of a dis-tringas, 21 Vin. Abr. 189, pi. 2, note, notwithstanding it was not prayed for at the venire facias, as it was in this case); nor where denizens and aliens were joint defendants. 21 Vin. Abr. 188, pi. 10. In all these cases, possibly in others, even the courts of England might refuse a jury de medietate, notwithstanding the peremptory terms of the statute of Edw. 3, which declares that “in all manner of inquests and proofs” amongst aliens and denizens, one half of the inquest or proof “shall” be denizens, and the other half of aliens, if so many &c. But neither these nor similar exceptions abrogate the general rule, or render it, in my opinion, the less obligatory. Neither do they, or the terms of our statute under which their observance may well be justified, render it, as seems to be supposed, wholly discretionary or optional with the court, in all cases, to grant or withhold the privilege. The law, in my opinion, is imperative; and equally so in reference both to the general rule and the acknowledged exceptions. The court, in this view, has no discretion to grant the writ in the excepted cases, nor to refuse it in others. In no case is the grant or denial ex gratia. *In some cases the alien may have no right to claim it: but in all others the right to claim it does exist, and, in my opinion, not as a matter of favour, but ex debito justitise,- — ■ a right as absolute and as perfect as that to a jury composed of twelve men ; and to this extent I wish to be understood in expounding the statute as imperative.
It may be true that in England this privilege may have been allowed anciently ex gratia, — by special grant from the crown (Trials per Pais 210,) as serjeant Hawkins supposes it may now in cases of treason; 2 Hawk. P. C. ch. 43, %% 37, p. 420. But our constitution, which forbids the exercise by the executive, of any prerogative by virtue of any law, statute or custom of England, did not design that the kingly prerogative of dispensing favours to prisoners ex mera gratia, should be transferred to the judiciary. “To leave it in the breast of the judge to relax or supersede general restrictions and rules whenever he shall think particular cases not within the reason of them,” has been always thought of dangerous tendency. 4 Burn’s Eccles. Law 88; Eearne on Remainders 429. An arbitrary and uncontrolled discretion, even in a judge, majr be well defined the law of tyrants. “It is always unknown: it is different in different men : it is casual, and depends upon constitution, temper and passion. In the best, it is oftentimes caprice: in the worst, it is every vice, folly *761 and passion to which human nature is liable.” The consequences o± such a discretion would be peculiarly mischievous under our judicial system, administered as it is by upwards of twenty judges, each in his particular circuit. The law of one circuit might differ from that in another, and no one indeed would be able to say what would be the law in any case, before it should be pronounced; depending, as it would, upon the circumstances of the case, or the humour of the judge; and no means would exist, in this or any other *courl, of remedying the uncertainty or enforcing uniformity, where the will of the judge alone was the law of the case.
But it cannot be seriously urged that the authority to be exercised by the courts, in this or in any case, is discretionary in the sense in which that authority might have been, or may now be, exercised by the Ring of England. It is not a royal prerogative which they possess, but at most a judicial discretion, governed by well settled principles, and liable to be controlled by the proper appellate tribunals. Thus viewing it, let us enquire what are the grounds upon which the circuit court refused to impanel a jury de medietate in the present case.
The fact of alienage was proved to the satisfaction of the court. The writ was applied for in proper time; was actually awarded (without objection, as far as appears, by the court of the prosecution), and was duly executed. A part of the aliens summoned appeared, and two were impaneled. The prisoner then applied for sup-pletory process, to render the privilege to which the court had deemed him entitled, effectual. Such process, in either of the modes in which he was willing to take it, was authorized by law. But the court refused its aid; thus, in effect, suddenly and without the suggestion of any reason whatever, retracting the grant, by refusing to make it effectual, though the means were admitted to be within its reach.
It is said, we are bound nevertheless to presume that this refusal of the court to carry its own judgment and precept into effect, was upon good grounds.
The general proposition, that the decisions of courts of competent jurisdiction are to be held well founded, will be readily admitted. But this doctrine has no application where error in point of law in the judgment of an inferior court appears to an appellate tribunal. Nor, in criminal cases at least, can any matters of fact be inferred by argument, as constituting the grounds of *such judgment. In the present case, for my own part, looking only to the record, I am unable to conjecture, and therefore cannot presume, any sufficient reason whatever for such refusal. The case is shewn to be one coming under none of the exceptions already stated. The proof was complete that the prisoner was an alien; and he prayed for the precept in due time. The grant of the precept itself implies a concession of his title to have it; and the commonwealth’s attorney admitted a sufficiency of such jurors as would satisfy its exigency. What ground is there for presumption, where there is nothing to shew that any additional fact appeared, or that any new evidence was offered? Prima facie at least, it was a case for a writ de medietate. The court must so have considered it. Is it not incumbent then on the prosecution, to shew the grounds upon which, after it was actually awarded, its due enforcement was refused? If it was discreet in the court in the first instance (as I conceive it most clearly was) to award the writ, it cannot well be that it was also discreet to render it nugatory. To give on due consideration, and take away without suggesting a reason, is not discretion, but caprice. The right to the process being conceded, the right to all means necessary and proper to give it full effect, and vindicate the authority of the court, would seem to follow of course, on general reasoning. But the principle rests upon more solid grounds. The settled doctrines of the law establish its correctness in reference to the particular question before us, and shew that in all cases where a tales becomes necessary to supply a deficiency of the principal panel summoned on a writ de medietate, the tales must be of such as are deficient, — denizens if denizens be wanting, and aliens if there be a defect of aliens; and that this is so, even where the tales are taken de circumstantibus. 10 Rep. 104. It is error, I apprehend, if the tales does not pursue the venire facias. Trials per Pais 74, 214. ‘ ‘If the *venire facias be per medietatem linguae, the tales ought to be per medietatem linguae.” Id. 72. And it is said, ‘ ‘if eight indigenae and four alieni-genae be impaneled, it is ill; because it is not per medietatem.” 21 Vin. Abr. 188, pi. 5. (This must be understood, provided a sufficiency can be found to complete the jury according to law.) Here the jury appears to be composed of ten denizens, and two aliens only, although a sufficiency of aliens could have been had. If it be said that the court, notwithstanding it had directed a jury de medietate, might subsequently, and without assigning any reason, retract or disappoint the grant, still this does not cure the error; for, admitting this, the jury in such case must be altogether of denizens. If the case then rests upon that ground, the court, retracting the privilege, or refusing to carry it into effect, could not lawfully subject the prisoner to be tried by any other jury than one composed wholly of good and lawful freeholders. There can be no lawful trial except by such a jury, or a jury composed, at the instance of an alien, the one half of good and lawful freeholders, and the other of aliens, if to be bad. The jury in the present case was neither a jury under the special provision for juries de medietate, nor under the ancient law, but constituted in a manner which, under the circumstances, was unauthorized by and unknown to the law of England, or that of our own state.
If upon the facts, so far as they are disclosed in the record, the prisoner was not entitled to a jury de.medietate, I can imagine no state of facts sufficient to give him such title. In conferring upon our courts the power to bestow a privilege, originating *762 in England, and, until adopted by the american states, probably existing in no other country, it seems reasonable to suppose (there being no definite bounds prescribed by our own law) that the mode and measure of its enjoyment were intended to be regulated by the practice and principles regulating *them in England. This would be so, I think, upon the reason of the thing, independent of the consideration that our language, laws and customs are, in the main, either identical with or similar to those of Great Britain; that the decisions of the english courts are, where applicable, habitually referred to and adopted by,our own; and that the very process by which this particular privilege is enforced, as almost all the process we use, is that framed in England, and preserved by the saving clause of our act repealing the british statutes. Looking then to England, nothing further was ever required to entitle an alien to a jury de medietate, so far as I have seen, than that he should allege or prove his alienage, and pray for the writ in proper time. The same rule, I infer, prevails in New York. In the case of The People v. M’Lean, 2 Johns. Rep. 381, the only question apparently raised was whether the jury de medietate might be summoned instauter. Although it would seem from the statute cited in the case (Laws of New York, vol. 1, p. 377-9,) that the right to such a jury rested upon implication, rather than any express provision, the right does not seem to have been contested; nothing more appears than that the prisoner ‘ ‘suggested his alienism, which was admitted.”
It may be thought, that the application being to the discretion of the court, facts should be proved tending to shew that a prejudice existed on the part of the citizens against those of the nation to which the prisoner belonged. But in the first place, if any such general prejudice exist in the circuit where he is arraigned, he has a right to a change of venue, wholly independent of the provision relative to juries de med-ietate: and in the next place, if the prejudice be national, and such as' to justify an application for a jury de medietate, the judge himself might not escape the contagion, and thus the privilege would be most apt to be withheld when it was most needed.
*1 forbear to go into the question of policy discussed at the bar. Surely, however, it is a mistake to suppose that it was against the policy of Great Britain, and much more that it was against that of the colonies, to encourage the settlement to foreigners. The anxiety of our own state, on the contrary, to afford such encouragement, is strongly expressed in the statutes of naturalization, one of which passed as early as 1671; see 2 Hen. stat. at large, p. 289, 464. The settlements of the french protestant refugees in this state and in the Carolinas, of the swedes and dutch in New York &c. all go to disprove the suggestion alluded to, that the colonial policy was adverse to the introduction of foreigners. Pour thousand germans are said to have been imported into Pennsylvania in 1750. Indeed, as. it has been strongly expressed, “the colonies now forming the United States may be considered as Europe transplanted.” I have not fully examined what states grant or refuse juries de medietate. The privilege is not allowed in North Carolina; State v. Antonio, 4 Hawks’s Rep. 200. In South Carolina it is granted by express statute passed in 1783, nearly in the words of the 28 Edw. 3. In Maryland and Pennsylvania it is also said to exist; and in the last was judicially awarded on the ground of usage, shewn by rather loose evidence of a single instance, although no law of the state directly recognized.it, and although the chief justice (M’Kean) was of opinion that the reasons which gave rise to the statute of Edw. 3, did not apply to the then government of Pennsylvania. 1 Dali. 73.
But the policy or impolicy of the law is a question addressing itself to a different department of the government. It is enough for us that we find it on the statute bookand I deem it my duty, until the legislature shall think proper to repeal it, to give it a candid exposition and full effect.
*1 will add a single remark. It may be supposed that the privilege of a jury de medietate linguas ought not to be accorded to those who speak the same language as ourselves. But the statute which originally conferred it in England is not per medietatem linguae, but by the moiety of aliens; and so runs the writ or venire facias. 21 Vin. Abr. 189, (in margin); Rastall’s Entries 265. Since the era of our independence, the english and ourselves have stood towards each other in the relation of foreigners: and I cannot doubt that every american citizen, if im-pleaded in the courts of England, may now demand this privilege, which, (as already said,) before it was adopted by the states of America, or some of them, into their codes, it was the boast of England was indulged to strangers in no other country in the world.
The result of my best reflections is a conviction that the circuit superior court of Chesterfield erred in overruling the motion mentioned in the bill of exceptions, and in refusing to give to the petitioner the full benefit of the writ de medietate linguae, authorized by law, and issued by its own dire.ction: and consequently that the judgment ought to be reversed, and a new trial awarded.
Writ of error denied.